Trenton R. Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH CASTILLO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PRIME HYDRATION LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff Elizabeth Castillo ("Plaintiff") brings this Class Action Complaint against Defendant Prime Hydration LLC ("Defendant" or "Prime") individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE ACTION

1. Plaintiff brings this consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Prime Hydration Grape Sports Drink (the "Product"[1]), which is prominently labeled and marketed as a healthy drink with antioxidants, electrolytes and vitamins to "refresh, replenish, and refuel," when, in fact, Plaintiff's testing has revealed that the Product contains per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, artificial.

2. PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3. In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4. Defendant formulates, manufactures, markets, and sells the Product, which they they uniformly represent as a healthy hydration drink that is the "perfect boost for every endeavor."

5. Despite being on the market for less than two years, Prime already ranks sixth in

---

[1] As alleged herein, Defendant conceals the presence of PFAS in the Product. Accordingly, discovery will reveal the exhaustive list of substantially similar products that are included in this action.

[2] https://pubs.acs.org/doi/10.1021/acs.est.1c06990 (last accessed February 24, 2023).

[3] https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last accessed February 24, 2023).

CLASS ACTION COMPLAINT

sports drink sales in the United States.[4] Prime's rapid success owes largely to its marketing and labeling representations, which are designed to set its Product apart from the litany of competitors in this space.

6.     Defendant's uniform marketing is intentionally designed to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Product is a healthy hydration drink that contains nutritious ingredients such as vitamins and antioxidants, and is free from ingredients which are known to be harmful to human health.

7.     However, despite Defendant's consistent and pervasive marketing representations, Plaintiff's independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

8.     The presence of PFAS is entirely inconsistent with Defendant's uniform representations.

9.     As a result of Defendant's misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

10.     Accordingly, Plaintiff brings this suit to halt Defendant's dissemination of false and misleading representations and to correct the false and misleading perceptions that Defendant's representations have created in the minds of reasonable consumers.

11.     Plaintiff seeks damages, injunctive relief, and other equitable remedies for themselves and for the proposed classes.

## **PARTIES**

12.     Plaintiff Elizabeth Castillo is a resident of Salinas, Monterey, California, and was, at all times relevant hereto, a citizen of California.

13.     Defendant Prime Hydration LLC is a corporation organized under the laws of Kentucky with its corporate headquarters located at 2858 Frankfort Ave, Louisville, Kentucky 40206.

---

[4] https://frontofficesports.com/logan-paul-ksi-prime-hydration-youth-sports/

CLASS ACTION COMPLAINT

**JURISDCTION AND VENUE**

14. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because a Plaintiff and Defendant are citizens of different states.

15. This Court has personal jurisdiction over the Defendant because they maintain their transact business in this State and District, have substantial aggregate contacts with this State and District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this State and District, and because they purposefully availed themselves of the laws of the State of California, and further because a Plaintiff Castillo purchased the Product in this State and District.

16. In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, specifically Plaintiff Castillo's purchase occurred in this District.

**FACTUAL ALLEGATIONS**

*Defendant's Business*

17. The Product is one of several sports beverages produced and sold by Prime, a company founded by popular YouTube content creators Logan Paul and Olajide William Olatunji, aka KSI.[5]

18. In its first year, Prime generated more than $250 million in retail sales, owing largely to the popularity of its founders, who have over 39 million subscribers on their YouTube channels.[6]

19. Prime's rapid success has led to strategic partnerships with Arsenal Football Club,[7]

---

[5] https://www.bbc.com/news/newsbeat-64145389 (last visited June 21, 2023).
[6] https://theconversation.com/prime-a-youtuber-expert-explains-how-logan-paul-and-ksis-drink-became-so-popular-201792 (last visited June 29, 2023)
[7] https://www.arsenal.com/arsenal-prime-hydration-drink-partner-ksi-logan-paul-emirates-stadium (last visited June 29, 2023)

1    the Ultimate Fighting Championship[8], and various other professional sports organizations.

2        20.    The Product at issue is part of Prime's Hydration line, a line of sports drinks which

3    boast ingredients including 10% coconut water, branched-chain amino acids ("BCAAs"), B-

4    vitamins, electrolytes and antioxidants. The Product is sugar-free, relying on acesulfame potassium

5    and sucralose as artificial sweeteners.

6        21.    In the words of its founders, Prime was created "to fill the void where great taste

7    meets function."[9]

8        22.    The Product is sold directly to consumers through Prime's website, in addition to

9    being sold at convenience stores, grocery stores, and other retailers nationwide.

10   ***Defendant's False and Deceptive Nutrition Representations***

11       23.    Beginning with the front label, the Product is uniformly represented as a healthy

12   "hydration drink" with no artificial colors or flavors that contains numerous beneficial ingredients.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27       [8]    https://www.sportspromedia.com/news/ufc-prime-sponsor-logan-paul-ksi/?zephr_sso_ott=
     eEQrlo (last visited June 29, 2023)
28       [9]   https://drinkprime.com/pages/about-prime (last visited June 29, 2023)

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

24.     The Product's side label boasts 250 mg BCAAs, B Vitamins, antioxidants and 835 mg electrolytes.



CLASS ACTION COMPLAINT

25.     BCAAs are the building blocks of protein. BCAA supplementation has become popular in recent years because BCAAs have been shown to reduce delayed onset muscle soreness following exercise, build muscle, limit fatigue, and help burn fat.[10]

26.     Vitamin B12 has health benefits as it plays an essential role in red blood cell formation, cell metabolism, nerve function, and the production of DNA.[11]

27.     Antioxidants are man-made or natural substances that may prevent or delay some types of cell damage and fight the free radicals in the body that are linked to diabetes, heart disease, and cancer.[12]

28.     Electrolytes are essential minerals that are vital to many key functions in the body, such as regulating muscle contractions and keeping the body hydrated.[13]

29.     Prime purposefully highlights these ingredients, which are known to contribute to health and sports performance, in order to convince consumers that the Product is in fact a healthy drink that is good for the body.

30.     On the Product's left side label, it represents that the Product is designed to help consumers "refresh, replenish, and refuel," and "is the perfect boost for every endeavor." These representations are carefully selected to convince consumers that the Product will replenish depleted nutrients and otherwise restore the body to an optimized state. Nothing about these representations would lead consumers to believe that the Product would actually *introduce* harmful chemicals into the body.

---

[10] https://www.menshealth.com/uk/nutrition/a26303726/bcaa-benefits-complete-guide/
[11] https://www.mayoclinic.org/drugs-supplements-vitamin-b12/art-20363663 (last visited February 24, 2023).
[12] https://www.healthline.com/nutrition/antioxidants-explained
[13] https://www.cedars-sinai.org/blog/electrolytes.html

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10



11   31.   All of Prime's uniform marketing is designed to convince reasonable consumers

12   that the Product is a healthy hydration drink containing various minerals, vitamins, and

13   supplements known to improve the body's overall health and athletic performance.

14   32.   Accordingly, reasonable consumers fairly believe that the Product is a healthy drink

15   option that does not contain ingredients known to be harmful to the human body.

16
17
18
19
20
21
22
23
24
25
26



27   33.   Nothing on the Product's label indicates the Product contains harmful PFAS

28

CLASS ACTION COMPLAINT

chemicals.

***PFAS Chemicals and Associated Risks***

34.   PFAS are a category of highly persistent and potentially harmful <u>man-made</u> <u>chemicals</u>, which include Perfluorooctanoic acid ("PFOA") and Perfluorooctanesulfonic acid ( PFOS").[14]

35.   PFAS are <u>not naturally occurring</u>.[15] They were first developed by scientists in the 1940s.[16] Thus, they are indisputably "artificial".

36.   The man-made PFAS chemicals, which are in the Product, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

37.   PFOS in particular is well-known to negatively impact the human body and the environment.

38.   Given the deleterious effects of PFOS on the body and environment, it is one of the most commonly studied[17] and commonly regulated.

39.   A November 2012 research report titled "Durable Water and Soil Repellent Chemistry in the Textile Industry"[18] explained:

> PFOA and PFOS, the most widely known and studied long-chain PFAAs, have been shown to be persistent in the environment, have long elimination half-life in wildlife and humans, and have toxicological properties of concern. Due to these properties, regulatory actions have been put in place or are being considered in several countries to manage these substances.

40.   PFAS are a source of concern, due to various widespread environmental presence, bio-accumulative properties, extreme persistence and evidence of adverse health effects.[19]

41.   Consequently, the recognition of these hazardous properties and global distribution

---

[14] https://www.epa.gov/pfas/pfas-explained (last visited February 24, 2023).

[15] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (last visited February 24, 2023).

[16] https://www.epa.gov/chemical-research/research-and-polyfluoroalkyl-substances-pfas (last visited February 24, 2023).

[17] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (last visited February 24, 2023).

[18] https://uploads-ssl.webflow.com/5c4065f2d6b53e08a1b03de7/5db6eece578efb688bee2bed_DWR_Report.pdf (last visited February 24, 2023).

[19] https://www.sciencedirect.com/science/article/abs/pii/S0960852421011494 (last visited February 24, 2023).

CLASS ACTION COMPLAINT

1   has led the scientific, regulatory and industrial communities to engage in international efforts to

2   curb the production and uses of PFAS.[20]

3       42.   Importantly, PFOS and PFOA have been phased out of production[21] since the early

4   2000s, and *prohibited from manufacture and most uses in European Union countries since 2008*

5   *(Directive 2006/122/EC)."*[22]

6       43.   Diet is considered a major route of PFAS exposure for humans, and reasonable

7   consumers purchasing the Product would not expect it to contain harmful man-made chemicals,

8   such as PFAS.[23]

9       44.   The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown

10  that exposure to certain levels of PFAS may lead to:"[24]

       a.   Reproductive effects such as decreased fertility or increased high blood
            pressure in pregnant women.

       b.   Developmental effects or delays in children, including low birth weight,
            accelerated puberty, bone variations, or behavioral changes.

       c.   Increased risk of some cancers, including prostate, kidney, and testicular
            cancers.

       d.   Reduced ability of the body's immune system to fight infections, including

       e.   reduced vaccine response.

       f.   Interference with the body's natural hormones.

       g.   Increased cholesterol levels and/or risk of obesity.

---

[20] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8536021/ (last visited February 24, 2023).
[21] *Id.*
[22]   https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32006L0122  (last  visited
February 24, 2023).
[23] https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (last visited February 24, 2023).
[24]   https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-
risks-pfas (last visited February 24, 2023).

CLASS ACTION COMPLAINT

45.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[25]



46.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[26]

47.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[27]

---

[25] https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last visited February 24, 2023).

[26] *Id.*

[27] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (last visited February 24, 2023).

CLASS ACTION COMPLAINT

48.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[28]

49.     According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[29]

50.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[30]

51.     Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Product is free from artificial ingredients like PFAS.

52.     Defendant has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not free from "artificial flavors" or do not have the same purported health benefits.

53.     Reasonable consumers purchasing the Product would believe, based on Defendant's representations, that the Product does not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

***Plaintiff's Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

54.     Plaintiff sought independent third-party testing to determine whether the Product contained PFAS chemicals.

55.     Plaintiff's independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS.

---

[28] *Id.*
[29] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last visited February 24, 2023).
[30] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (last visited February 24, 2023).

CLASS ACTION COMPLAINT

56.     Plaintiff's testing detected material levels of PFAS in the Product, including significant levels of Perfluoro-1-butanesulfonic acid (PFBS), Perfluoro-n-decanoic acids (PFDA), Perfluoro-n-dodecanoic acid (PFDoA), Perfluoro-n-heptanoic acid (PFHpA), Perfluoro-n-octanoic acid (PFOA), Perfluoro-n-tetradecanoic acid (PFTeDA), Perfluoro-n-undecanoic acid (PFUdA), and Perfluorooctanesulfonic acid ("PFOS").

57.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers to toxic synthetic chemicals in direct contradiction to their uniform label claims.

58.     In fact, the EPA recently tightened its lifetime health advisory levels for PFOA and PFOS exposure in drinking water. For PFOS, the recommendation is 0.02 ppt.[31]

59.     The amount of PFOS found within the Product from Plaintiff's testing is approximately **three times** the recommended lifetime health advisory for drinking water.

***Defendant's Unlawful Conduct***

60.     At all times relevant to this action, Defendant knew, or at minimum should have known, that its Product contains PFAS.  Indeed, Defendant, as the manufacturer of the Product, determines the ingredients contained therein, as well as all quality control processes.  Defendant should, and can, control for the PFAS chemicals which are contained in its Products.

61.     There are steps that Defendant can take to reduce or eliminate PFAS chemicals in the Product.  As the EPA notes,

> Certain technologies have been found to remove PFAS from drinking water, especially Perfluorooctanoic acid (PFOA) and Perfluorooctanesulfonic acid (PFOS), which are the most studied of these chemicals. Those technologies include activated carbon adsorption, ion exchange resins, and high-pressure membranes. These technologies can be used in drinking water treatment facilities, in water systems in hospitals or individual buildings, or even in homes at the point-of-entry, where water enters the home, or the point-of-use, such as in a kitchen sink or a shower.[32]

Additionally, studies show that UV lights can be used to degrade or eliminate PFAS chemicals. When combined with testing and processes to controls to prevent the introduction of PFAS chemicals, these methods can drastically limit the PFAS chemicals in the Products.  Yet, Defendant

---

[31] *Id*.

[32] https://www.epa.gov/sciencematters/reducing-pfas-drinking-water-treatment-technologies (last visited July 10, 2023).

CLASS ACTION COMPLAINT

does not undertake these mitigation efforts and does not disclose the level of PFAS chemicals in the Products.

62.     Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its Product's ingredients and health benefits. Further, consumers rely on Defendant to not omit material facts regarding the presence of synthetic chemicals in its Product that are known to pose a risk to human health. Such omissions are material to reasonable consumers' purchasing decisions.

63.     Defendant's representations about the Product's numerous health benefits, as described herein, are false and misleading because products containing toxic, man-made ingredients like PFAS are not healthy or nutritious by definition.

64.     Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members, regarding the presence of PFAS chemicals in its Product. Accordingly, these acts and practices by Defendant are deceptive.

65.     Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Product would conform with its representations and, as such, would not contain harmful man-made PFAS chemicals.

66.     Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Product worthless or less valuable.

67.     If Defendant had disclosed to Plaintiff and putative Class Members that its Product contained PFAS chemicals, Plaintiff and putative Class Members would not have purchased Defendant's Product or they would have paid less for them.

68.     Plaintiff and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

69.     Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

70.     The materiality of the representations described herein also establishes causation

CLASS ACTION COMPLAINT

between Defendant's conduct and the injuries Plaintiff and the Class Members sustained.

71.     Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Product using the health-focused Nutrition Representations and other representations described herein in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

72.     The presence of PFAS chemicals in Defendant's Product is entirely inconsistent with its uniform representations.

73.     Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Product is made with healthy ingredients that are beneficial for the human body and therefore do not contain toxic chemicals which are known to be harmful to human health. No reasonable consumer would consider Defendant's Product as being a healthy sports hydration drink if they knew that the Product contained harmful, artificial PFAS chemicals.

74.     Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

75.     In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the Product over comparable products that are made from or contain synthetic or artificial ingredients.

76.     Plaintiff and Class Members all paid money for the Product, however, they did not obtain the full value of the advertised Product due to Defendant's omissions as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Product than they would have had they known the truth about the Product's artificial, man-made, and harmful ingredients. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

77.     Defendant's widespread marketing campaign portraying the Product as containing only healthy and natural ingredients as detailed herein, is misleading and deceptive to consumers because the Product contains chemicals which are known to be harmful to humans.

CLASS ACTION COMPLAINT

Plaintiff brings this action on behalf of the proposed Classes to stop Defendant's misleading practices.

**PFAS Renders the Products Adulterated, Misbranded and Illegal to Sell**

95.     The Products are used as a drink for humans and are therefore a "food" which is regulated by the U.S. Food and Drug Administration. See 21 U.S.C. § 321(f).

96.     The Federal Food, Drug & Cosmetic Act ("FDCA") establishes numerous regulations regarding the safety of food which is sold to consumers, including by creating various labeling requirements.

97.     Under the FDCA, a food is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." See 21 U.S.C. § 342(a)(1). Even in the event that a poisonous or deleterious substance is not an "added" substance (such as in the case of unintended contamination), food is still deemed adulterated if the quantity of the substance renders it injurious to health. Id.

98.     As detailed herein, PFAS, and specifically the PFOA and PFOS found in Defendant's Products, are indisputably linked to negative health consequences and is therefore a "poisonous or deleterious substance."

99.     Furthermore, PFOA and PFOS were discovered in Defendant's Products at levels that exceed the EPA's recommended limit for drinking water, which supports a finding that even if the PFOA and PFOS are present due to contamination, they are still present in the Product at levels that are injurious to health.

100.     The FDA has not established any tolerances for PFAS in food. See 21 U.S.C. § 346.

101.     The FDCA does permit the limited use of PFAS in food contact applications, such as its use as a resin in forming gaskets, o-rings, and other parts of food processing equipment. This is due, in part, to the minimal risk of PFAS migrating from food processing equipment into the food itself.  However, as a result of studies which questioned the safety of long-chain PFAS such as PFOA and PFOS, the FDA worked with manufacturers beginning in the early 2000s to discontinue the use of long-chain PFAS chemicals in food contact applications.  In 2016, the FDA revoked regulations authorizing the remaining use of PFOA in food contact applications. As of

CLASS ACTION COMPLAINT

November 2016, long-chain PFAS like PFOA are no longer used in food contact applications sold in the United States.

102.     Accordingly, there is no use of PFOA or PFOS that is currently permitted by the FDA.

103.     Thus, regardless of the source of PFAS in the Products, it is nevertheless "adulterated" by virtue of the significant levels of toxic PFOA and PFOS present.

104.     Under the FDCA, a food is deemed "misbranded" if "its labeling is false or misleading in any particular." See 21 U.S.C. § 343(a).

105.     The Products are misbranded they do not disclose the presence of PFAS.

106.     Food that is deemed "adulterated" or "misbranded" may not be manufactured, distributed or sold in the United States. See 21 U.S.C. § 331. Adulterated and misbranded products thus have no economic value and are legally worthless.

107.     California has expressly adopted the federal food labeling requirements as its own. Thus, a violation of federal food labeling laws is an independent violation of California's Sherman Law and actionable as such.

108.     The mere presence of PFOA and PFOS in the Products render them adulterated and misbranded.

109.     If Defendant had disclosed to Plaintiff and putative Class Members that the Products contained or risked containing PFAS and thus risked users to PFAS exposure, Plaintiff and putative Class Members would not have purchased the Products or they would have paid less for the Products.

110.     As a seller of a food product, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of toxic contaminants such as PFAS, including through regular testing, especially before the Products are injected into the stream of commerce for consumers to consume.

111.     But based on Plaintiff's independent testing results set forth above, Defendant made no reasonable effort to test its Products for PFAS. Nor did it disclose to Plaintiff in any advertising or marketing that its Products contained PFAS, let alone at levels that are many multiples of the

1  lifetime advisory limit set by the EPA.

2  ## PLAINTIFF'S FACTUAL ALLEGATIONS

3  ### *Plaintiff Elizabeth Castillo*

4      78.    Plaintiff Elizabeth Castillo is a citizen and resident of the state of California.

5  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendant's

6  Product that contained PFAS.  More specifically, during the class period Plaintiff purchased the

7  Product numerous times at an El Rey Market, a Wal-Mart, a 7-Eleven, and a Foods Co. in Salinas,

8  California.

9      79.    Prior to her purchase, Plaintiff reviewed the labeling, packaging, and marketing

10  materials of the Product, including those set out herein.  Thus, Plaintiff understood that based on

11  Defendant's claims, the Product was a healthy sports hydration beverage that was safe for use and

12  human consumption, and was free of harmful, man-made chemicals like PFAS.  Plaintiff

13  reasonably relied on these representations and warranties in deciding to purchase the Product, and

14  these representations were part of the basis of the bargain in that she would not have purchased

15  the Product, or would not have purchased it on the same terms, if the true facts had been known.

16      80.    As a direct result of Defendant's material omissions, Plaintiff suffered and

17  continues to suffer, economic injuries.

18      81.    Plaintiff continues to desire to purchase the Product from Defendant if she can rely

19  on that Product to be safe and free from any artificial ingredients, including those known to pose

20  a risk to human health. However, concerned about the health consequences of PFAS and

21  Defendant's omissions detailed herein, Plaintiff is unable to determine if Defendant's Product is

22  actually free of harmful chemicals like PFAS in the future.  Plaintiff understands that the

23  composition of the Product may change over time, but as long as Defendant may freely advertise

24  the Product as safe or healthy when it actually contains material levels of PFAS, then when

25  presented with false or misleading information when shopping, she will be unable to make

26  informed decisions about whether to purchase Defendant's Product and will be unable to evaluate

27  the different prices between Defendant's Product and competitor's products, which do in fact

28  contain only natural and nutritious ingredients and are free of PFAS.

CLASS ACTION COMPLAINT

1

2   **INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM**

3       82.     Defendant's wrongful conduct harms the public-at-large.

4       83.     PFAS chemicals, also known as "forever chemicals," are a category of highly

5   persistent and toxic man-made chemicals that have been associated with numerous negative health

6   effects for humans.

7       84.     PFAS chemicals are known to negatively impact the human body, including, but

8   not limited to, decreased fertility, developmental effects or delays in children, increased risk of

9   cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the

10  immune system, interference with hormones and increased cholesterol levels.

11      85.     Because Defendant's deceptive advertising is ongoing and directed to the public,

12  and because Defendant continues to sell its Product containing PFAS chemicals, the deception

13  poses an ongoing risk to the public.

14      86.     As such, a public injunction must be provided in order to enjoin Defendant's

15  continued harm of consumers and the public-at-large.

16                  **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

17      87.     Defendant had actual knowledge, or should have had actual knowledge, that its

18  Product contained artificial, man-made PFAS chemicals which pose a risk of harm to human

19  health.

20      88.     Although Defendant was aware of the deception in their advertising, marketing,

21  packaging, and sale of the Product given the inclusion of PFAS chemicals, it took no steps to

22  disclose to Plaintiff or Class Members that its Product contained PFAS chemicals.

23      89.     Despite its knowledge, Defendant has omitted the Product as having qualities and

24  characteristics it does not, while concealing the fact that its Product contains PFAS chemicals.

25      90.     Defendant has made and continues to make material omissions to consumers that

26  the fact that the Product contains PFAS, to promote sales of its Product.

27      91.     Defendant has concealed and otherwise omitted material facts that would have been

28  important to Plaintiff and Class Members in deciding whether to purchase the Product.

CLASS ACTION COMPLAINT

Defendant's omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

92.     The PFAS chemicals in the design and/or manufacture of Defendant's Product was not reasonably detectible to Plaintiff and Class Members.

93.     At all times, Defendant actively and intentionally omitted the qualities and characteristics of the Product, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in its Product. Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

94.     Defendant's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Product contained artificial, man-made PFAS chemicals.

95.     Defendant omitted the Product and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

96.     As a result of Defendant's omission and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Product.

97.     Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Product contained PFAS chemicals. Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Product.

1

2     **FEDERAL RULE OF CIVIL POROCEDURE 9(B) ALLEGATIONS**

3     98.     Although Defendant is in the best position to know what content it placed on its

4     packaging, website(s), and other marketing and advertising during the relevant timeframe, and the

5     knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of

6     PFAS chemicals in the Product to Plaintiff and consumers, to the extent necessary, Plaintiff

7     satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

8     99.     **WHO**: Defendant made representations on the Product's packaging, online, and its

9     marketing and advertising of the Product.

10    100.    **WHAT**: Defendant's conduct here was, and continues to be, deceptive and

11    fraudulent because of its health-focused representations and omissions which lead reasonable

12    consumers to believe that the Product is safe for human consumption and beneficial to human

13    health. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the

14    Product was manufactured and sold with the represented qualities. Defendant knew or should have

15    known this information is material to reasonable consumers, including Plaintiff and Class

16    Members in making their purchasing decisions, yet it continued to pervasively market the Product

17    as possessing qualities they do not have.

18    101.    **WHEN**: Defendant made material omissions during the putative Class periods and

19    at the time Plaintiff and Class Members purchased the Product, prior to and at the time Plaintiff

20    and Class Members made claims after realizing the Product contained harmful man-made

21    chemicals, and continuously throughout the applicable Class periods.

22    102.    **WHERE**: Defendant's marketing message was uniform and pervasive, carried

23    through omissions on the Product's packaging, as well as on website(s) and other media channels

24    used to market and advertise the Product.

25    103.    **HOW**: Defendant made material omissions regarding the presence of PFAS

26    chemicals in the Product.

27    104.    **WHY**: Defendant made material omissions detailed herein for the express purpose

28    of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the

CLASS ACTION COMPLAINT

Product over other brands that did not make similar health-focused representations, the effect of which was that Defendant profited by selling the Product to many thousands of consumers.

105.   **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have, absent Defendant's omissions.

## CLASS ACTION ALLEGATIONS

106.   Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and the members of the following class:

> **Nationwide Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

107.   Plaintiff Castillo brings this action individually and as the representative of all those similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and the members of the following class:

> **California Class:** During the fullest period allowed by law, all persons who purchased the Product within the State of California for personal use and not for resale.

108.   Members of the classes described are referred to herein as "Class Members" or members of the "Class."

109.   Plaintiff reserves the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

110.   The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's

CLASS ACTION COMPLAINT

counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

111. **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiff is informed and believe that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

112. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

a. Whether Defendant omitted and/or failed to disclose material facts concerning the Product;

b. Whether Defendant's conduct was unlawful; unfair; fraudulent and/or deceptive;

c. Whether Defendant breached express warranties to Plaintiff and Class Members;

d. Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the proposed Class;

e. Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce on behalf of herself and the other Members of the proposed Class. Similar or identical

CLASS ACTION COMPLAINT

statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

113.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendant's uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiff or to any particular Members of the Class.

114.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Members of the Class he seeks to represent; they have retained counsel competent and experienced in complex class action litigation; and they will prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

115.    **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.  The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

116.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate

CLASS ACTION COMPLAINT

their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Members of the Class could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation Of Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff Castillo and the Nationwide Class)**

117. Plaintiff Castillo brings this count on behalf of herself and the Nationwide Class and repeats and re-alleges all previous paragraphs as if fully included herein.

118. As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiff's Magnuson-Moss claim.

119. The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

120. Plaintiff and the Nationwide Class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the Product for personal and household use and not for resale or commercial purposes.

121. Plaintiff purchased the Product costing more than $5 and their individual claim is greater than $25 as required by 15 U.S.C. §§ 2302€ and 2310(d)(3)(A).

122. Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

123. The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

124. The MMWA provides a cause of action for breach of warranty, including implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

125. The Defendant has breached the implied warranties of merchantability by failing to

CLASS ACTION COMPLAINT

provide merchantable goods. The Product at issue is not merchantable or fit for its ordinary purposes because the Product contains ingredients that render it adulterated and not fit to be consumed as a sports hydration drink.

126.    Therefore, Defendant's Product is not merchantable or fit for its ordinary purposes given it contains man-made and synthetic PFAS and renders the product not nutritious or good for human health.

127.    In its capacity as warrantor, and by the conduct described herein, any attempt by Defendant to limit the warranties in a manner that it does is not permitted by law.

128.    By Defendant's conduct as described herein, Defendant has failed to comply with their obligations under their implied promises, warranties, and representations.

129.    Plaintiff and the Nationwide Class fulfilled their obligations under the implied warranties and express warranties for the Product.

130.    As a result of Defendant's breach of warranties, Plaintiff and the Nationwide Class are entitled to revoke their acceptance of the Product, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

**COUNT II**
**Violation of the California Consumer Legal Remedies Act**
**("CLRA"), Civil Code §§ 1750,** *et seq.*
**(On Behalf of Plaintiff  Castillo and the California Class)**

131.    Plaintiff Castillo brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

132.    The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

133.    The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

134.    Plaintiff and California Class Members are "consumers" as defined by Civil Code § 1761(d).

CLASS ACTION COMPLAINT

135.   Defendant is a "person" as defined by Civil Code § 1761(c).

136.   The Product qualifies as "goods" as defined by Civil Code § 1761(a).

137.   Plaintiff and the California Class Members' purchases of the Product are "transactions" as defined by Civil Code § 1761(e).

138.   As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

      (a)   "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

      (b)   "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

      (c)   "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

      (d)   "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

139.   Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Product had benefits or characteristics that they did not actually have.

140.   As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding Product's benefits or characteristics that they did not in fact have, and represented the Product to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiff and California Class Members.

141.   The Product is not healthy or safe for human consumption, and therefore is of an

CLASS ACTION COMPLAINT

inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that the Product meets a certain standard or quality.

142.    As detailed above, Defendant violated the CLRA when it advertised the Product with the intent not to sell it as advertised and knew that the Product was not as represented.

143.    Specifically, Defendant marketed and represented the Product and omitted information that  no reasonable consumer would believe the products to be safe or healthy if they knew they contained a potentially harmful chemical such as PFAS.

144.    Defendant's deceptive practices were specifically designed to induce Plaintiff and California Class Members to purchase or otherwise acquire the Product.

145.    Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the Product manufactured by Defendant. Defendant's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the quality, safety, and reliability of the Product.

146.    Defendant omitted and concealed information and material facts from Plaintiff and California Class Members.

147.    In their purchase of the Product, Plaintiff and California Class Members relied on Defendant's representations and omissions of material fact that the Product contained harmful PFAS.

148.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

149.    Pursuant to Cal. Civ. Code § 1782, Plaintiff notified Defendant in writing by certified mail sent on May, 22, 2023, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above and give notice to all affected consumer of Defendant's intent to do so. Defendant never responded to Plaintiff's letter and Plaintiff seeks all damages and remedies available to it under the CLRA.

150.    Further, in accordance with Civil Code § 1780(a), Plaintiff and the other California

CLASS ACTION COMPLAINT

Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

### COUNT III
**Violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Castillo and the California Class)**

151.    Plaintiff Castillo brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

152.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

153.    Plaintiff and Class Members who purchased Defendant's Product suffered an injury by virtue of buying products in which Defendant omitted the Product's true quality, reliability, safety, and use. Had Plaintiff and Class Members known that Defendant omitted material information regarding the Product, they would not have purchased the Product.

154.    Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this complaint.

155.    There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Product.

156.    Plaintiff and Class Members who purchased Defendant's Product had no way of reasonably knowing that the Product was deceptively packaged, marketed, advertised, and labeled, was not safe for human consumption, and was unsuitable for its intended use as a sports hydration beverage. Thus, Plaintiff and California Class Members could not have reasonably avoided the harm they suffered.

157.    Specifically, Defendant marketed, labeled, and represented the Product with the Nutrition Representations and other representations described herein, when in fact the Product contains PFAS, which no reasonable consumer would believe was in products represented as nutritious, healthy, and containing significant health benefits.

158.    The gravity of the harm suffered by Plaintiff and Class Members who purchased Defendant's Product outweighs any legitimate justification, motive or reason for packaging,

marketing, advertising, and labeling the Product in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and California Class Members.

159. The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff and Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Product and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

160. Defendant has violated the UCL's proscription against engaging in unlawful business practices as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, violations of the FDCA, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

161. Defendant has also violated the UCL's proscription against engaging in unfair business practices. Defendant's acts, omissions, and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

162. Defendant has further violated the UCL's proscription against engaging in fraudulent business practices. Defendant's claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

163. Plaintiff and the other Class Members suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

164. As a result of Defendant's above unlawful, unfair and fraudulent acts and practices,

CLASS ACTION COMPLAINT

Plaintiff, on behalf of himself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices.

165.   Additionally, Plaintiff Castillo seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff Castillo and other Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

**COUNT IV**
**Violation of the California False Advertising Law ("FAL")**
**California Business and Professions Code §§ 17500, *et seq.***
**(On Behalf of Plaintiff Castillo and the California Class)**

166.   Plaintiff Castillo brings this count on behalf of herself and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

167.   The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

168.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

169.   Specifically, Defendant failed to disclose the Product contained harmful PFAS and such a fact is material to reasonable consumers.

170.   At the time of its misrepresentations, Defendant was either aware that Product contained PFAS, which no reasonable consumer would expect would be in products given it is not included anywhere in the Product's label, was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed and omitted

and failed to disclose this information to Plaintiff and California Class Members.

171.   Defendant's descriptions of the Product were false, misleading, a material omission, and likely to deceive Plaintiff and other reasonable consumers.

172.   Defendant's conduct therefore constitutes deceptive or misleading advertising.

173.   Plaintiff has standing to pursue claims under the FAL as they reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding the Product when selecting and purchasing the Product.

174.   In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of the Product, Plaintiff and California Class Members purchased the Product.

175.   Had Defendant disclosed the true nature of the Product (that it contains or risks containing PFAS), Plaintiff and California Class Members would not have purchased the Product or would have paid substantially less for it.

176.   As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff and California Class Members who paid for the Product, which contained harmful chemicals and was therefore not healthy or nutritious.

177.   As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiff, on behalf of himself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices.

178.   Additionally, Plaintiff Castillo seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff Castillo and other Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

CLASS ACTION COMPLAINT

1

2

**COUNT V**

3

**Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, et seq. and California Commercial Code § 2314**

4

**(On Behalf of Plaintiff Castillo and the California Class)**

5

179.     Plaintiff Castillo brings this count on behalf of herself and the California Class and

6

repeats and re-alleges all previous paragraphs as if fully included herein.

7

180.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq.,

8

and California Commercial Code § 2314, every sale of consumer goods in the State of California

9

is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are

10

merchantable, as defined in that Act. In addition, every sale of consumer goods in California is

11

accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the

12

manufacturer or retailer has reason to know that the goods as represented have a particular purpose

13

and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable

14

goods consistent with that represented purpose.

15

181.     The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ.

16

Code § 1791(a).

17

182.     Plaintiff and the Class Members who purchased the Product are "retail buyers"

18

within the meaning of Cal. Civ. Code § 1791.

19

183.     Defendant is in the business of manufacturing and/or producing the Products and

20

therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

21

184.     Defendant impliedly warranted to retailer buyers that the Product was merchantable

22

in that it would: (a) pass without objection in the trade or industry under the contract description,

23

and (b) were fit for the ordinary purposes for which the Product is used. For a consumer good to

24

be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these

25

implied warranties because the Product was unsafe for consumption due to its inclusion of PFAS.

26

Therefore, the Product would not pass without objection in the trade or industry and were not fit

27

for the ordinary purpose for which they are used.

28

185.     Plaintiff and Class Members purchased the Product in reliance upon Defendant's

34

skill and judgment in properly packaging and labeling the Product.

186.    The Product was not altered by Plaintiff or the Class Members.

187.    The Product was defective at the time of sale. The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

188.    Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

189.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that it was unfit for use and posed a significant safety risk.

190.    On May 22, 2023 prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a notice letter, apprising Defendant of its breach of warranties. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in breach of its warranties and demanding that they cease and desist from such violations. The letter stated that it was sent on behalf of all other similarly situated purchasers. Plaintiff waited 30 days and never heard back from the Defendant.

191.    Plaintiff and the Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing Plaintiff as Class Representatives and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Classes;

(c) Ordering Defendant to pay restitution to Plaintiff and the Classes;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiff and the Classes;

CLASS ACTION COMPLAINT

(f) Awarding Plaintiff and members of the Classes statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Classes;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff hereby demand a jury trial of the claims asserted in this Class Action Complaint.

Dated: August 2, 2023                                   Respectfully submitted,

By:  */s/ Trenton Kashima*
     Trenton R. Kashima (SBN 291405)
     **MILBERG COLEMAN BRYSON**
     **PHILLIPS GROSSMAN PLLC**
     402 West Broadway St., Suite 1760
     San Diego, CA 92101
     Tel: (619) 810-7047
     tkashima@milberg.com
     Rachel Soffin*
     **MILBERG COLEMAN BRYSON**
     **PHILLIPS GROSSMAN, PLLC**
     First Tennessee Plaza
     800 S. Gay Street, Suite 1100
     Knoxville, Tennessee 37929
     Tel: 865-247-0080
     rsoffin@ milberg.com

     Nick Suciu III*
     **MILBERG COLEMAN BRYSON**
     **PHILLIPS GROSSMAN, PLLC**
     6905 Telegraph Road, Suite 115
     Bloomfield Hills, MI 48301
     Tel: (313) 303-3472
     nsuciu@milberg.com

     Erin Ruben*
     **MILBERG COLEMAN BRYSON**
     **PHILLIPS GROSSMAN PLLC**
     900 W. Morgan Street

CLASS ACTION COMPLAINT

Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com

*\* Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff and the Proposed*
*Class*

CLASS ACTION COMPLAINT

## **AFFIDAVIT OF ELIZABETH CASTILLO**

I, Elizabeth Castillo, declare as follows:

1.      I am one of the Plaintiffs in the referenced case and specifically one of the Plaintiffs in the Cause of Action for Violations of the Consumer Legal Remedies Act.  I am a competent adult, over eighteen years of age, and a resident of the State of California.  I am making this declaration in support of my Class Action Complaint against Defendant Prime Hydration LLC.

2.      I purchased a Defendant's Prime Hydration product in Salinas, California in an El Rey Market, a Wal-Mart, a 7-Eleven, and a Foods Co.  As such, the transactions which give rise to this complaint occurred within Salinas County.  Additionally, Defendant advertises and retails Prime Hydration Grape Sports Drink in Salinas County, thus Defendant conducts substantial business within this County.

3.      Accordingly, pursuant to California Code of Civil Procedure, section 1780, Northern District of California is the proper venue for Plaintiff's California Consumer Legal Remedies Act claims.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on __Aug 2, 2023__ in __Salinas__, California.

*Elizabeth Castillo*
Elizabeth Castillo (Aug 2, 2023 19:14 PDT)

Elizabeth Castillo

CLASS ACTION COMPLAINT